1  Leslie T. Gladstone, Esq.  (SBN 144615)
2  Christin A. Batt, Esq.  (SBN 222584)
   FINANCIAL LAW GROUP
3  401 Via Del Norte
   La Jolla, CA 92037
4  Telephone: (858) 454-9887
   Facsimile:  (858) 454-9596
5  E-mail:  ChristinB@flgsd.com

6  Attorneys for Leslie T. Gladstone, Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No.:  15-07986 -CL7 |
| SEAN PAUL NEVETT and SHANNON LEE NEVETT, | Adv. No.: |
| Debtors. | **COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS AND DISALLOWANCE OF CLAIM** |
| LESLIE T. GLADSTONE, Chapter 7 Trustee, | [11 U.S.C. §§ 502, 544, 548, 550; Cal. Civil Code §§ 3439, *et seq*.] |
| Plaintiff, | Date:         None Set |
| v. | Time:         None Set |
| A1 GROUP, INC., a Nevada corporation *fka* FREEBUTTON, INC., | Dept:          Five (5) |
| Defendant. | Honorable Christopher B. Latham |

Plaintiff Leslie T. Gladstone, the chapter 7 trustee (the "**Trustee**" or "**Plaintiff**") in the bankruptcy case of debtors Sean Paul Nevett and Shannon Lee Nevett (collectively, the "**Debtors**"), by and through her counsel, as and for her Complaint against A1 Group, Inc. ("**Defendant**"), respectfully alleges on behalf of the estate of the Debtors as follows:

**JURISDICTION AND VENUE**

1.     This proceeding arises in the bankruptcy case *In re Sean Paul Nevett and Shannon Lee Nevett*, Case No. 15-07986-CL7 (the "**Case**"), which was commenced on December 16, 2015

1  (the "**Petition Date**"), when the Debtors filed a voluntary petition under chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of California (the "**Court**").

2. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. Sections 157 and 1334 and the Bankruptcy Code.

3. This adversary proceeding is a core proceeding under 28 U.S.C. Section 157(b) and this Court may, consistent with Article III of the Constitution, enter final orders or judgments and conduct a trial absent consent of the parties. If it is determined that this Court may not enter final orders or judgments or conduct a trial absent consent of the parties, Plaintiff hereby so consents.

4. Venue is proper in the Southern District of California pursuant to 28 U.S.C. Section 1409 because the Debtors' Case is pending in this Court.

5. An actual creditor holding an unsecured claim allowable under 11 U.S.C. Section 502 exists as of the date of each of the transfers sought to be avoided herein and as of the Petition Date pursuant to 11 U.S.C. Section 544(b)(1) including, but not limited to, Lori Perfetto.

## PARTIES

6. Plaintiff is the chapter 7 trustee in this Case and was appointed by the United States Trustee for the Southern District of California on or about the Petition Date to represent the interests of the Debtors' estate (the "**Estate**") in connection with the Debtors' Case. On or about December 12, 2017, the Court ordered the substantive consolidation of the Estate and Checkpoint Marketing, Inc. (collectively, the "**Consolidated Debtors**").

7. Plaintiff is informed and believes and thereon alleges that Defendant is a Nevada corporation, formerly known as FreeButton, Inc., with its principal place of business located in Fort Lauderdale, Florida.

## SUMMARY

8. Plaintiff is informed and believes and thereon alleges that during the four (4) years before the bankruptcy filing, the Debtors caused Checkpoint Marketing, Inc., the consolidated debtor, to transfer a total of $25,000.00 to Defendant. Plaintiff is informed and believes and thereon

alleges that these transfers were part of a fraudulent scheme operated by the Debtors while the Debtors were insolvent.

9.  Plaintiff seeks to avoid the transfers to Defendant for the benefit of the Estate.

## GENERAL ALLEGATIONS

A. **Nevett and Checkpoint**

10.  **Debtor Sean Paul Nevett** ("**Nevett**") resides in Encinitas, California. Plaintiff is informed and believes and thereon alleges that Nevett previously held Series 7 and 63 licenses and worked for various brokerage firms from at least 1990 through 1995. In 1997, Nevett was censured, fined $4,000, and suspended by the National Association of Securities Dealers ("**NASD**") for four business days. In 2003, Nevett settled charges brought by the Securities and Exchange Commission that he had violated Section 5 of the Securities Act of 1933 (the "**Securities Act**"), and consented to, among other things, entry of a permanent bar from violating Section 5 of the Securities Act, and a two-year bar from participating in the distribution of any penny stock. *SEC v. Nevett*, Civil Action No. 1:03CV01994 (D.D.C. Sept. 25, 2003) (PLF).

11.  **Checkpoint Marketing, Inc.** ("**Checkpoint**") is the now dissolved Nevada corporation formed by Nevett in 2000. Plaintiff is informed and believes and thereon alleges that Nevett is the sole officer, director, and shareholder of Checkpoint. Plaintiff is informed and believes and thereon alleges that Checkpoint had no assets and no employees. Nevett used Checkpoint interchangeably with himself. Nevett used Checkpoint's bank accounts and American Express credit accounts as his personal accounts. Nevett used Checkpoint's bank accounts and American Express credit accounts to pay his personal debts, the Debtors' lavish living expenses, and the living expenses of others. Nevett also used Checkpoint's bank accounts and credit accounts in furtherance of his fraudulent schemes, described below.

C. **Debtors' Lavish Lifestyle**

12.  According to the Debtors' sworn Statement of Financial Affairs and/or their sworn annual U.S. Individual Income Tax Returns, in 2012 the Debtors earned gross income of $118,655; in 2013 the Debtors earned gross income of $124,952; in 2014 the Debtors earned gross income of $125,723; and in 2015 the Debtors earned gross income of $125,000. The Debtors enjoyed an

uber-lavish lifestyle, notwithstanding, by comparison, their comparatively modest, reported annual income.

13. During the same period from 2012 to 2015, the Debtors' personal living expenses exceeded $35,000 per month, on average. They resided in a multi-million dollar, Encinitas beach home, with a monthly first mortgage payment of more than $6,500. Debtors also maintained a second home at Cabo San Lucas, Mexico. They drove expensive, late-model exotic and/or luxury automobiles by Ferrari, Mercedes-Benz, and Audi, with monthly car payments of more than $3,500. The Debtors traveled extensively, both domestic and international. They wintered in Aspen and at Montage Deer Valley. In the spring, they travelled to Louisville, Kentucky for horse racing events, including the Kentucky Derby. Nevett paid for international travel to London, Taipei, Cape Town, Paris, Ibiza, and Athens among other foreign locales. The Debtors made annual travel trips to an island in Fiji where they rented the entire island, consisting of 17 private accommodations, for their family and friends.

14. Mrs. Nevett devoted much time and expense to personal shopping. During the period 2012 to 2015, charges on her Checkpoint-issued American Express card alone averaged approximately $11,000 to 12,000 per month. The charge history for Mrs. Nevett's Checkpoint-issued American Express card shows charges for regular purchases from upscale clothing/personal merchandise retailers such as Nordstrom's, Saks Fifth Avenue, Neiman Marcus; frequent online purchases from Amazon; dining out and food/grocery purchases; spa and beauty services; and travel.

15. The Debtors retained the services of "nannies" to care for their school age/teenage children. The nannies were also provided American Express charge cards that were paid monthly from Checkpoint's bank account at Chase Bank. During the period 2012 to 2015, the credit card charge history by Debtors' nannies averaged nearly $6,000 per month.

16. During the period 2012 to 2015, Nevett's parents and a purported assistant also charged their personal living and travel expenses on Checkpoint's American Express accounts. Specifically, during this period, Nevett's stepfather John Batliner charged more than $187,000,

Nevett's mother Ramona Batliner charged more than $104,000, and Brenna Montano charged more than $211,000, all for their personal living and travel expenses.

### D. SEC Complaint Regarding Fraudulent Stock Manipulation

17. Troy Flowers ("**Flowers**") is a close friend and business partner of Nevett. Plaintiff is informed and believes and thereon alleges that Flowers resides in Solana Beach, California, that Flowers previously held Series 7, 24, 55, and 63 licenses, and worked for various brokerage firms from at least 1995 through 2000. In 2003, Flowers pleaded guilty to one count of fraud by a broker-dealer to induce the sale of a security in the State of California, and was sentenced to five years of probation. Following a suspension in 2001, Flowers was also permanently barred by NASD in 2002 from association with any NASD member in any capacity.

18. On or about July 19, 2017, the Securities and Exchange Commission ("**SEC**") filed a Complaint against Nevett, Flowers, and Flowers's company, Case No. 3-17-cv-01456-JAH-JLB, now pending in the U.S. District Court for the Southern District of California. The SEC alleges that between 2012 and 2014 Nevett and Flowers engaged in a scheme to profit by fraudulently manipulating the price of publicly traded stocks. To accomplish this fraudulent scheme, the SEC alleges that Nevett and Flowers first arranged for the purchase of a public shell company. They then used multiple accounts held in the names of third parties, which Nevett and Flowers controlled, to engage in "matched trading"—trading that appears to involve third parties buying or selling stock, when in reality it was trading by, or controlled by, Nevett or Flowers or both. Lighthouse Holdings Enterprises, Inc., the entity owned by Nevett's stepfather, is named by the SEC as an account holder that appeared to be an unrelated third-party stockholder. This matched trading artificially increased the price of the stock and created the false appearance that there was an active market and real demand for the shares of the new company. Nevett and Flowers then sold their shares of the company on the open market, leaving the company with no funding and a negligible stock value, while shareholders who purchased during the manipulation were left with stock that is virtually worthless.

19. The SEC complaint names two companies, Licont Corp. and Artec Global Media, Inc., as two of the companies acquired by Nevett and Flowers in their fraudulent stock manipulation

scheme. The SEC alleges that Nevett and Flowers obtained approximately $3.8 million in illegal proceeds from this fraudulent stock manipulation scheme.

20. The SEC alleges that by engaging in this conduct Nevett and Flowers violated Sections 17(a)(1) and (3) of the Securities Act, Sections 9(a)(1) and 10(b) of the Securities Exchange Act of 1934, and Rules 10(b)-5(a) and (c) thereunder. The SEC seeks permanent injunctions prohibiting future violations of the federal securities laws, joint and several disgorgement of the defendants' ill-gotten gains along with prejudgment interest, civil penalties, and a penny stock bar against defendants.

21. According to the SEC complaint, Nevett and Flowers both asserted their Fifth Amendment privilege during testimony in the SEC's investigation of their conduct concerning the matters alleged in the SEC complaint.

**E.    The Debtors' Insolvency**

22. Plaintiff is informed and believes and thereon alleges that during at least the four years before the Petition Date (December 2011 to December 2015), the Debtors were insolvent, failed to pay existing creditors or paid existing creditors from funds obtained from new loans at usurious interest rates or from illegal stock manipulations, while syphoning off substantial funds to pay for their lavish lifestyle.

23. Plaintiff is informed and believes and thereon alleges that during the four years before the Petition Date, Nevett essentially operated a Ponzi-like scheme in which new lenders were paid from the loan proceeds of later loans or the proceeds of illegal stock manipulation; it was or should have been obvious to Nevett that his purported "business" was losing money; and Nevett was looting money from the loan proceeds for his own benefit in such a way that made it unlikely to impossible that any legitimate business could succeed.

24. According to the Debtors' bankruptcy schedules, signed under penalty of perjury, the Debtors incurred the following debts before December 2011 (four years before the Petition Date) that remain unpaid as of the Petition Date:

(a)    $25,000 owed to Deanne Gage and incurred in 2006;

(b)    $36,731 owed to JPMorgan and incurred in 2006;

|     |     |     |
|---|---|---|
| 1 | (c) | $900,000 owed to Mitch Pullman and incurred in 2009; |
| 2 | (d) | $550,000 owed to Steve Zeldin and incurred in 2009; |
| 3 | (e) | $50,000 owed to Lori Perfetto and incurred in 2010; |
| 4 | (f) | $200,000 owed to Robert Friedman and incurred in 2010; and |
| 5 | (g) | $100,000 owed to Robert Walsh and incurred in 2011. |

25. According to the Debtors' bankruptcy schedules, all the above described debts, which total **$1,911,731**, are liquidated and neither contingent nor disputed.

26. According to the SEC Complaint, Nevett and Flowers began their fraudulent stock manipulation scheme by at least 2012.

27. Plaintiff is informed and believes and thereon alleges that on or about May 28, 2015, a complaint was filed against Nevett in the case entitled *BQR Capital, LLC v. Nevett*, Case No. 30-2015-00790261, in California Superior Court, County of Orange. The Complaint alleges causes of action for Breach of Fiduciary Duty, Fraud–Intentional Misrepresentation; Negligent Misrepresentation; Negligence; Wash Trading; Market Manipulation; and False Statements Re Securities and prays for an award of damages of at least $1,100,000.

28. According to the Debtor's bankruptcy schedules, as of the Petition Date, the Debtors had approximately $5,982,062 in liabilities and approximately $1,720,000 in assets. Plaintiff is informed and believes and thereon alleges that most of the Debtors' assets are uncollectible.

29. Plaintiff is informed and believes and thereon alleges that, at the time the transfers were made to Defendant, the Debtors' financial condition was such that the sum of the Debtors' debts was greater than all of their property, at a fair valuation.

30. The unsecured claims currently filed in this Case total more than $82 million.

31. Plaintiff is informed and believes and thereon alleges that the funds in the Estate are insufficient to pay all allowed claims in full.

/ / /

/ / /

/ / /

/ / /

**F.     During the Four Years Before the Petition Date, Nevett Obtained New Loans from Third Parties at Usurious Interest Rates to Pay Prior Loans or American Express Charges.**

32.     Plaintiff is informed and believes and thereon alleges that in 2008 Nevett obtained loans from unrelated third parties and used the loan proceeds to invest in the stock of a few local businesses.

33.     Plaintiff is informed and believes and thereon alleges that the interest rate on at least one loan obtained by Nevett in 2009 (from Steven Zeldin for $300,000) was 18% annually.

34.     Plaintiff is informed and believes and thereon alleges that the interest rate on at least two loans obtained by Nevett in early 2010 (from RFF Family Partnership, L.P. for a total of $450,000) was 2.5% per month (approximately 26.82% annually).

35.     Plaintiff is informed and believes and thereon alleges that by 2011 and continuing to the Petition Date, Nevett borrowed money from several individuals and entities, paying 12%–30% interest and used the loan proceeds—not for legitimate investment purposes—to pay off lenders on earlier notes or to pay Checkpoint's American Express charges.

36.     Plaintiff is informed and believes and thereon alleges that from 2011 to the Petition Date neither Nevett nor Checkpoint operated a legitimate business.

**G.     During the Four Years Before the Petition Date, Nevett Used Checkpoint's American Express Accounts for Fraudulent Purposes.**

37.     From 2011 to the Petition Date, Checkpoint had three American Express accounts (accounts ending -3009, -8004, and -9002, which was a replacement account for -8004).

38.     Plaintiff is informed and believes and thereon alleges that Checkpoint's American Express account ending -3009 was used primarily by Nevett's parents, John and Ramona Batliner, and Brenna Montano for various personal living and travel expenses, and also by yet other persons responsible for caring for the Debtors' school age/teenage children.

39.     Plaintiff is informed and believes and thereon alleges that Checkpoint's American Express accounts -8004 and -9002 were used by Nevett and debtor Shannon Nevett for personal living and travel expenses.

40. Plaintiff is informed and believes and thereon alleges that Checkpoint's American Express accounts -8004 and -9002 were also used by Nevett or Flowers or both to transfer substantial amounts of money to companies owned by Robert Wheat (Advanced Solar Technologies, Inc. and Solar Tech, Inc.), companies in which Flowers was or became invested (Buggy World and San West, Inc.), and companies alleged by the SEC to have been part of the stock manipulation scheme (Artec Consulting Corp.).

41. Plaintiff is informed and believes and thereon alleges that from March 2014 through October 2015, Nevett or Flowers or both transferred at least $1.5 million to San West, Inc. by way of charges to Checkpoint's American Express accounts. Plaintiff is informed and believes and thereon alleges that many of the American Express charges paid to San West, Inc. correspond to a bank wire transfer deposit a few days later from San West, Inc. to Checkpoint's Chase checking account -7491 in an amount more or less equal to the amount of the charge less approximately 4.0%. Plaintiff is informed and believes and thereon alleges that, because payment for the charge(s) on the American Express account were not due until approximately 30 days after the end of the then-billing cycle, Nevett used these American Express charges paid to San West, Inc. and the cash proceeds wired by San West, Inc. to the Debtors' Checkpoint bank account as a mechanism to obtain, from the unwitting American Express, short-term loans and/or cash advances totaling more than $1.1 million, for an approximate 4% discount fee.

42. Robert Wheat ("**Wheat**") is one of Nevett's closest friends since college. Plaintiff is informed and believes and thereon alleges that Wheat formed Advanced Solar Technologies, Inc., a California corporation, in 2004 and is the company's Chief Executive Officer. Plaintiff is also informed and believes and thereon alleges that Wheat formed Solar Tech, Inc. (now Solar Tech Energy Systems, Inc.), a California corporation, in 2004 and is the company's sole officer, director, and owner.

43. Plaintiff is informed and believes and thereon alleges that from November 2011 to October 2015, Nevett transferred more than $1.7 million to Advanced Solar Technologies, Inc. and Solar Tech, Inc., two companies owned by Wheat. These transfers were likewise made by way of charges to Checkpoint's American Express Accounts. Nevett testified that these transfers were not

used to purchase solar equipment.  Plaintiff is investigating the benefit, if any, Debtors received for these transfers.

44.    Plaintiff is informed and believes and thereon alleges that, at the time of the transfers to Defendant, Defendant was or should have been aware of Nevett's fraudulent schemes.

**H.    Substantive Consolidation of the Estate and Checkpoint Marketing, Inc.**

45.    On November 2, 2017, Plaintiff filed a motion in the Debtors' Case to substantively consolidate the Estate and Checkpoint retroactive to the Petition Date for the purpose of providing standing to Plaintiff to pursue avoidable transfers, which were caused by Nevett and made by Checkpoint, for the benefit of creditors in this Case.  No opposition to Plaintiff's motion was filed.

46.    On or about December 12, 2017, the Court granted Plaintiff's motion and ordered the substantive consolidation of the Estate and Checkpoint retroactive to the Petition Date.   As a result, property of the Estate includes all property of Checkpoint and Plaintiff has standing to pursue avoidance of transfers of Checkpoint's property under Sections 544, 547, and 548 of the Bankruptcy Code.

**I.    The Transfers to Defendant**

47.    Plaintiff is informed and believes and thereon alleges that during the four (4) years before the Petition Date, Nevett caused Checkpoint to transfer a total of $25,000.00 to Defendant (each a "**Transfer**" and collectively, the "**Transfers**") by charges to Checkpoint's American Express account number ending -8004.  A schedule of the Transfers is shown below.

| Date | Method of Transfer | Payee | Amount |
|---|---|---|---|
| 2/8/2013 | Amex -8004 | FreeButton, Inc. | $5,000.00 |
| 3/15/2013 | Amex -8004 | FreeButton, Inc. | $20,000.00 |
|  |  | **TOTAL** | **$25,000.00** |

A copy of each Transfer is attached hereto as Exhibit A.

48.    Plaintiff is informed and believes and thereon alleges that Defendant has not repaid to the Debtors or the Estate the funds paid to it.

/ / /

49. To the extent Defendant has filed a proof of claim in the Debtors' Case or has otherwise requested payment from the Debtors, the Estate, or the Trustee (collectively, the "**Claims**"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to such Claims for any reason, including, but not limited to, 11 U.S.C. Section 502, and such rights are expressly reserved. Notwithstanding this reservation of rights, Plaintiff seeks certain relief under 11 U.S.C. Section 502 as set forth below.

### FIRST CLAIM FOR RELIEF
### Avoidance of Fraudulent Transfers
### (11 U.S.C. §§ 544, 548(a)(1)(A), California Civil Code §§ 3439, *et seq.*)

50. Plaintiff realleges and incorporates by reference in this claim for relief Paragraphs 1 through 49 of this Complaint as though fully set forth herein.

51. The Transfers were transfers of an interest of the Consolidated Debtors in property.

52. The Transfers were made on or within four (4) years before the Petition Date.

53. Plaintiff is informed and believes and thereon alleges that the Transfers were made to or for the benefit of Defendant.

54. As alleged above, Plaintiff is informed and believes and thereon alleges that, during the four years before the Petition Date, Nevett operated a Ponzi-like scheme.

55. Plaintiff is informed and believes and thereon alleges that the Transfers to Defendant were made as part of this scheme.

56. Plaintiff is informed and believes and thereon alleges that the Transfers to Defendant were therefore made with the actual intent to hinder, delay, and/or defraud the Debtors' creditors.

57. Plaintiff is informed and believes and thereon alleges that, at the time the Transfers were made, the Debtors were insolvent or suffering unmanageable indebtedness.

58. The Transfers constitute fraudulent transfers under 11 U.S.C. Sections 544 and 548(a)(1)(A), and California Civil Code Sections 3439, *et seq.*, and are therefore avoidable by Plaintiff.

59. At the time the Transfers were made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. Section 502, including, but not limited to, Lori Perfetto.

/ / /

**SECOND CLAIM FOR RELIEF**
**Avoidance of Fraudulent Transfers**
**(11 U.S.C. §§ 544, 548(a)(1)(B), California Civil Code §§ 3439, *et seq.*)**

60. Plaintiff realleges and incorporates by reference in this claim for relief Paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61. The Transfers were transfers of an interest of the Consolidated Debtors in property.

62. The Transfers alleged herein were made on or within four (4) years before the Petition Date.

63. Plaintiff is informed and believes and thereon alleges that each Transfer was made to or for the benefit of Defendant.

64. As alleged in Paragraphs 10–46 above, Plaintiff is informed and believes and thereon alleges that during the four years before the Petition Date, Nevett operated a Ponzi-like scheme.

65. Plaintiff is informed and believes and thereon alleges that the Transfers to Defendant were made as part of this scheme and Defendant knew or should have known that the Transfers were part of this scheme.

66. Plaintiff is informed and believes and thereon alleges that the Debtors received less than reasonably equivalent value in exchange for the Transfers.

67. As alleged in Paragraphs 10–46 above, Plaintiff is informed and believes and thereon alleges that the Debtors were insolvent on the date that the Transfers were made or became insolvent as a result of the Transfers.

68. As alleged in Paragraphs 10–46 above, Plaintiff is informed and believes and thereon alleges that, at the time of each Transfer, the Debtors were engaged in business or transactions, or were about to engage in business or transactions, for which any property remaining with the Debtors was unreasonably small capital.

69. As alleged in Paragraphs 10–46 above, Plaintiff is informed and believes and thereon alleges that, at the time of each Transfer, the Debtors incurred debts that were beyond the Debtors' ability to pay as such debts matured.

70. The Transfers constitute fraudulent transfers under 11 U.S.C. Sections 544 and 548(a)(1)(B), and California Civil Code §§ 3439, *et seq.*, and are therefore avoidable by Plaintiff.

71. At the time the Transfers were made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. Section 502, including, but not limited to, Lori Perfetto.

### THIRD CLAIM FOR RELIEF
**Recovery of Avoided Transfers or Value Thereof**
**(11 U.S.C. § 550)**

72. Plaintiff realleges and incorporates by reference in this claim for relief Paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73. Plaintiff is informed and believes and thereon alleges that upon avoidance of the Transfers under the First and/or Second Claims for Relief alleged herein, Plaintiff is entitled, pursuant to 11 U.S.C. Section 550, to recover for the benefit of the Estate the property transferred or, if the Court so orders, the value of such property from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee.

### FOURTH CLAIM FOR RELIEF
**Disallowance of Claim**
**(11 U.S.C. § 502(d))**

74. Plaintiff realleges and incorporates by reference in this claim for relief Paragraphs 1 through73 of this Complaint as though fully set forth herein.

75. Plaintiff is informed and believes and thereon alleges that Defendant is an entity from which property is recoverable under 11 U.S.C. Section 550.

76. Plaintiff is informed and believes and thereon alleges that Defendant is a transferee of the Transfers, which are avoidable under 11 U.S.C. Sections 544 and 548, and California Civil Code Sections 3439, *et seq.*, as set forth above.

77. Plaintiff is informed and believes and thereon alleges that Defendant has not paid the amount of the Transfers, or turned over such Transfers, to Plaintiff for which Defendant is liable under 11 U.S.C. Section 550 as set forth in the Third Claim for Relief above.

78. Any and all Claims of Defendant and/or its assignees against the Estate must be disallowed until such time as Defendant pays or turns over to Plaintiff an amount equal to Defendant's liability under 11 U.S.C. Section 550.

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

On the First Claim for Relief:

1. For a determination by the Court that each Transfer was a fraudulent transfer within the meaning of 11 U.S.C. Sections 544 and 548(a)(1)(A), and/or California Civil Code Sections 3439, *et seq*.;

2. For a judgment against Defendant avoiding the Transfers in the total amount of at least $25,000.00, plus any additional amounts according to proof; and

3. For such other and further relief as the Court deems just and proper.

On the Second Claim for Relief:

4. For a determination by this Court that each Transfer was a fraudulent transfer within the meaning of 11 U.S.C. Sections 544 and 548(a)(1)(B), and/or California Civil Code Sections 3439, *et seq*.;

5. For a judgment against Defendant avoiding the Transfers in the total amount of at least $25,000.00, plus any additional amounts according to proof; and

6. For such other and further relief as the Court deems just and proper.

On the Third Claim for Relief:

7. For a judgment granting Plaintiff the right to recover, for the benefit of the Estate, the property transferred in the Transfers, or if the Court so orders the value of such property, from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee; and

8. For such other and further relief as the Court deems just and proper.

On the Fourth Claim for Relief:

9. For a judgment disallowing any Claim of Defendant and/or its assignee(s) against the Debtors' Estate to the extent provided for under 11 U.S.C. Section 502(d); and

10. For such other and further relief as the Court deems just and proper.

/ / /

/ / /

<u>On All Claims for Relief</u>:

Plaintiff seeks prejudgment and postjudgment interest, attorneys' fees, costs of suit, collection costs thereafter, and all other amounts allowed by law.

FINANCIAL LAW GROUP

Dated:  December 14, 2017                By:    /s/ Christin A. Batt
                                                Christin A. Batt, Esq.
                                                Attorneys for Leslie T. Gladstone, Trustee

# Exhibit A

**DUPLICATE COPY**

**AMERICAN EXPRESS** — Business Centurion® Card
CHECKPOINT MKET INC
SEAN NEVETT
Closing Date 02/17/13

**OPEN**

p. 1/25

Account Ending 6-58004

| New Balance | |
|---|---|
| Please Pay By | 03/04/13 |

→ See page 2 for important information about your account.

ⓘ Please note, your preset line is   You have spent 

**Membership Rewards® Points**
Available and Pending as of 01/31/13

For up to date point balance and full program details, visit membershiprewards.com

**Account Summary**

Previous Balance
Payments/Credits
New Charges
Fees

New Balance

Days in Billing Period: 28

**Customer Care**

Pay by Computer
open.com/pbc

Customer Care          Pay by Phone
1-800-297-3333         1-800-472-9297

→ See page 2 for additional information.

---

↓ Please fold on the perforation below, detach and return with your payment ↓

**Payment Coupon**
Do not staple or use paper clips

**Pay by Computer**
open.com/pbc

**Pay by Phone**
1-800-472-9297

**Account Ending 6-58004**
Enter account number on all documents.
Make check payable to American Express.

SEAN NEVETT
CHECKPOINT MKET INC
1135 TERMINAL WAY
STE 209
RENO NV 89502-2168

Please Pay By
**03/04/13**
Amount Due

AMERICAN EXPRESS
BOX 0001
LOS ANGELES CA 90096-8000

☐ Check here if your address or phone number has changed. Note changes on reverse side.

0000349991060255395    16  rl

**Detail Continued**     *Indicates posting date

|  |  | Foreign Spend | Amount |
|---|---|---|---|
| 02/08/13 | FreeButton, Inc. FreEncinitas    CA ▉4551 |  | $5,000.00 |

Continued on next page

**DUPLICATE COPY**



Business Centurion® Card
CHECKPOINT MKET INC
SEAN NEVETT
Closing Date 03/20/13



p. 1/27

Account Ending 6-58004

| New Balance | |
|---|---|
| Please Pay By | 04/04/13 |

**Membership Rewards® Points**
Available and Pending as of 02/28/13

For up to date point balance and full program details, visit membershiprewards.com

**Account Summary**

Previous Balance
Payments/Credits
New Charges
Fees

New Balance

Days In Billing Period: 31

**Customer Care**

Pay by Computer
open.com/pbc

Customer Care       Pay by Phone
1-800-297-3333     1-800-472-9297

See page 2 for additional information.

→ See page 2 for important information about your account.

ⓘ Please note, your preset line is [   ]  You have spent [   ]

↓ Please fold on the perforation below, detach and return with your payment. ↓

**Payment Coupon**
Do not staple or use paper clips

**Pay by Computer**
open.com/pbc

**Pay by Phone**
1-800-472-9297

**Account Ending 6-58004**

Enter account number on all documents.
Make check payable to American Express.

SEAN NEVETT
CHECKPOINT MKET INC
1135 TERMINAL WAY
STE 209
RENO NV 89502-2168

Please Pay By
04/04/13
Amount Due

Check here if your address or phone number has changed. Note changes on reverse side.

AMERICAN EXPRESS
BOX 0001
LOS ANGELES CA 90096-8000

0000349991060255395        16  H

**DUPLICATE COPY**

SEAN NEVETT — Account Ending 6-58004 — p. 22/27

**Detail Continued**  *Indicates posting date

| | Foreign Spend | Amount |
|---|---|---|
| 03/15/13 FreeButton, Inc. FreSolana Beach   CA  4551 | | $20,000.00 |

Continued on next page